Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JERMAINE VAUGHN, | : | |
| | : | |
| Petitioner, | : | Civ. No. 10-1397 (PGS) |
| | : | |
| v. | : | |
| | : | |
| MICHELLE RICCI, et al., | : | **OPINION** |
| | : | |
| Respondents. | : | |

**PETER G. SHERIDAN, U.S.D.J.**

## I.  INTRODUCTION

Petitioner, Jermaine Vaughn ("Petitioner"), is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"). (ECF No. 1.) For the following reasons, the petition is denied and a certificate of appealability shall not issue.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In March 1999, Petitioner was convicted of the robbery and shooting death of Adrian Davis. *See State v. Vaughn*, No. A-2877-06, 2009 WL 3460267 at *1 (Oct. 14, 2009). On Petitioner's first post-conviction relief ("PCR") collateral appeal, the New Jersey Superior Court Appellate Division summarized the factual background relevant here as follows:

The conviction arises from a chance encounter between Adrian Davis, [Petitioner] and co-defendant Jeremiah Bass during the evening of June 5, 1995. After driving around Trenton, stopping at his home to obtain a black hooded jacket and a green hooded sweatshirt, and consuming a forty-ounce bottle of malt liquor, [Petitioner] and co-defendant decided they needed money to get into parties. Both men were armed. As they walked down a street, [Petitioner] had his revolver in his hand and noticed the victim walking towards him. The man walked right up to [Petitioner] and co-defendant. After a momentary struggle, [Petitioner's] gun discharged, the man fell to the ground, and [Petitioner] and co-defendant walked away. The victim was pronounced dead at the hospital. A woman observed the entire encounter from the front window of her home. When she called police, she informed the dispatcher that the men had entered Marion Street on foot.

Soon, police observed two men on Marion Street fleeing the area on foot. After a foot pursuit, during which police observed co-defendant discard his gun and ammunition, the co-defendant was detained and arrested. Although police located a small chrome revolver and a spent .32 caliber shell casing in the pocket of a black jacket in an empty lot, [Petitioner] was not arrested until June 9, when police located him in the hospital recovering from a wound received in another incident on June 6.

*Id.* at \*1.

On appeal from the denial of his second PCR petition, the Appellate Division summarized the following relevant facts and history:

[Following Petitioner's arrest,] police advised [Petitioner] why he was in custody, and a detective administered his *Miranda*[1] rights. [Petitioner] waived his rights, and approximately two hours later provided a formal statement

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

in which he admitted shooting the victim. [Petitioner] explained the incident as follows: "As we got closer to the [victim] he saw my gun, and then he got up on me real quick, grabbed my jacket and pulled me towards him, and [that is] when the gun went off."

At [Petitioner's] 1999 trial, Detective Robert Sheehan of the Homicide unit testified that after being conveyed to the Trenton Police Department, [Petitioner] was placed in an interview room and advised that he was there for an investigation. Sheehan testified that [Petitioner] appeared coherent and clear-minded and stated he appeared to be "a very intelligent young man." The detective testified that he advised defendant of his *Miranda* rights, reviewed the waiver of rights form with him, and ensured that [Petitioner] understood his rights. Defendant subsequently waived his rights by affixing his signature on the signature line without asking Sheehan for any clarification. Detective Sheehan testified that after [Petitioner's] waiver, he was uncooperative and unwilling to speak, and made such statements as: "I'm not going to tell you anything;" "there's nothing you can do to me;" and "you don't have anything on me." After Detective Sheehan informed [Petitioner] of the evidence against him including witness testimony, recovered weapons, ballistics, and fingerprints, [Petitioner] told Detective Sheehan that "the guy didn't have to be a hero" and that he would tell him what happened.

Sheehan testified that [he obtained a formal statement regarding the shooting from Petitioner.] . . .

[Petitioner] testified at trial that after he was conveyed to the Trenton Police Department, he was advised of his *Miranda* rights, and voluntarily waived them. [Petitioner] testified that he agreed to provide Detective Sheehan with his statement. . . . On cross-examination, [Petitioner] admitted that he was given the opportunity to review his statement, initialed each page, and did not make any changes.

3

*See State v. Vaughn*, A-1497-16T1, 2018 WL 3614346 at \*1-2 (July 30, 2018).

Petitioner filed a direct appeal. The Appellate Division affirmed Petitioner's conviction and sentence, but remanded for a *Miranda* hearing. (ECF No. 9-34 at 1-13.) The New Jersey Supreme Court denied certification. (*Id.* at 26.)

The trial court held an evidentiary hearing on remand and found that Petitioner had not invoked his right to remain silent and that his confession was properly admitted. (ECF Nos. 9-20, 9-34 at 14.) Petitioner appealed and the Appellate Division affirmed Petitioner's conviction on June 7, 2004. (ECF No. 9-34 at 16-25.) The New Jersey Supreme Court denied certification on Petitioner's direct appeal. *State v. Vaughn*, 182 N.J. 143 (2004).

Petitioner filed a post-conviction relief ("PCR") petition. The PCR court denied his petition on January 10, 2007. (*See* ECF No. 9-34 at 27-49.) Petitioner appealed, and the Appellate Division affirmed the denial on October 14, 2009. *Vaughn*, No. A-2877-06, 2009 WL 3460267.

Petitioner filed his habeas petition on March 15, 2010. (ECF No. 1.) Respondents filed an answer on October 29, 2010. (ECF No. 9.) On or about September 30, 2013, Petitioner filed for a stay and abeyance, asking the Court to stay his Petition for Petitioner to return to state court and file a motion for a new trial based on newly discovered evidence. (ECF No. 25.) The Court granted Petitioner's motion for a stay. (ECF No. 32.)

4

Petitioner filed a motion for PCR relief and a new trial based on newly discovered evidence, which the PCR court denied. Petitioner appealed, and the Appellate Division affirmed the denial on July 30, 2018. *State v. Vaughn*, No. A-1497-16T1, 2018 WL 3614346 (July 30, 2018). The New Jersey Supreme Court denied certification on March 5, 2019. (ECF No. 35-2.)

This matter was reopened on April 17, 2019. (ECF No. 39.) However, Petitioner subsequently filed another PCR petition on May 31, 2019. On November 5, 2019, the Court again stayed this matter. (ECF No. 54.) On February 16, 2022, Petitioner filed a motion to reopen (ECF No. 59), which the Court granted on March 9, 2022. (ECF No. 60.)

## III. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 provides, the district court "shall entertain an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). District courts are required to give great deference to the

determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712

6

F.3d at 846 (*quoting Renico*, 559 U.S. at 773). As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 574 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

Finally, to the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C.

7

§ 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV. DISCUSSION

### A. Ground One

In Ground One, Petitioner argues that his Fifth Amendment rights were violated when Detective Sheehan did not scrupulously honor Petitioner's exercise of his right to remain silent. (ECF No. 1 at 9.) Petitioner argues that Detective Sheehan testified that Petitioner was "uncooperative" and "not willing to speak," which required Detective Sheehan to inquire if Petitioner was invoking his right to remain silent. (*Id.*)

On direct appeal, the Appellate Division considered Petitioner's claim that his confession had been improperly admitted based upon the failure of the investigating police officer to honor his assertion of his right to remain silent. (*See* ECF No. 9-34 at 1-13, *State v. Vaughn*, A-6299-98T4 (June 26, 2001).) The Appellate Division remanded the claim to the trial court for a hearing to allow the parties to "supplement the record with whatever additional evidence they may wish to present so that a fully informed decision may be reached regarding this contention." (*Id.* at 12.) On February 19, 2002, the trial court held a remand hearing and ultimately determined that Petitioner had not invoked his right to remain silent, rather he had voluntarily and knowingly waived his right to remain silent. (*See* ECF No. 9-20.)

Petitioner appealed to the Appellate Division arguing that the detective did not scrupulously honor Petitioner's exercise of his right to remain silent. (ECF No. 9-23 at 24.) The Appellate Division cited to the following findings from the trial court's decision on the remand hearing:

> [T]his court does hereby today, for purposes of this hearing, reiterate all of its findings made on the record on March 3, 1999, to support the determination that the [Petitioner's] statements were indeed admissible and the court then was convinced beyond a reasonable doubt that the [Petitioner] was given his *Miranda* rights, that he understood them, that he waived them, that he did so knowingly, voluntarily, and intelligently, and that he thereupon knowingly, voluntarily, and intelligently provided the statements which the court then admitted.
>
> The narrow focus of the proceedings today, as indicated, is whether or not the [Petitioner] invoked his right to remain silent. In that regard the court heard testimony from Detective Robert Sheehan who essentially repeated large portions of his testimony previously provided and also supplemented that testimony.
>
> * * * *
>
> Now, on cross-examination defense counsel articulately tested the credibility of this witness. And the detective did concede that in his testimony at the March 17, 1999 trial date that indeed the detective testified that the [Petitioner] was uncooperative and the [Petitioner] told the detective "I'm not going to tell you anything. There's nothing you can do to me," or words to that effect. "You don't have anything on me." The detective next explained, however, that when he testified that the [Petitioner] was not willing to speak, he also - - namely the [Petitioner] - - also followed up quickly with "Until he asked me what we had

on him and I told him." The detective summed up by saying, "It was very simple. The defendant was advised of his rights. He did not want to speak. I advised him what we had on him. Then he spoke to me and gave me a statement all in the same conversation without any undue passage of time."

Furthermore, Detective Sheehan testified that essentially [Petitioner] never did stop talking. And he further stated "I couldn't stop [Petitioner] from talking," supporting the witness' testimony that there was no passage of time here; that indeed this was one continuous conversation that they were having.

Now, in opposition to that testimony, [Petitioner] took the stand and with regard to this issue testified that he was brought to the Trenton Police Department on Friday, June 9, 1995. He was in a room with Detective Sheehan. The detective advised him of his right to remain silent. [Petitioner] testifies today for the first time on this issue, "I advised him I did want to talk to him about it. We kept going back and forth. Eventually I gave him a formal statement."

On cross-examination, [Petitioner] conceded that he recalled being given his rights, that he signed the form - - both parts, that he waived his rights, including his right to remain silent. He conceded yes, I signed it. He further conceded in cross-examination this morning that at trial on March 18, he recalls being asked questions regarding the giving of the statement and the questions regarding the understanding of his rights. He further conceded that he agreed everything was fine and that at no place or time at the trial did he indicate the exercise of his right to remain silent.

The court finds that there is truly no inconsistency in the testimony of Detective Sheehan and [Petitioner]. Detective Sheehan, this court finds . . is a highly

10

experienced law enforcement officer with well over thirty years of experience in working on major cases, that he was the lead detective on this case, and that it was his obligation to investigate the murder of Adriene Davis, that [Petitioner] was a suspect, that he was properly brought to police headquarters for the conduct of the detective's investigation. The court reiterates the finding that the [Petitioner] was meticulously given all of his *Miranda* rights and indeed that he signed an acknowledgment to that effect, as well as the waiver of those rights. And the subject clearly this court finds there was a conversation, and from the testimony of the detective the defense urges, based on the language that at first he was reluctant to talk to me or hesitant to talk to me, that therefore that constituted an exercise of the right to remain silent. In addition, [Petitioner] urges that based upon the testimony of the detective at the 3-17-99 trial wherein the defendant told the detective "I'm not going to tell you anything," that that constituted an irrevocable right to remain silent which barred Detective Sheehan from speaking to the defendant any further.

The court finds, based on the totality of the circumstances herein, quite to the contrary. The court finds that the statement "I'm not going to tell you anything" is taken out of context because that was immediately followed by statements of [Petitioner] "There's nothing you can do to me. You don't have anything on me," but immediately followed in the same conversation with the [Petitioner] in the same breath, as Detective Sheehan testifies and this court finds, asking the detective what do you have on me, followed by Detective Sheehan's response as to the nature of the evidence[.] . . . But nonetheless the court finds that this is one continuous conversation.

[Petitioner] did not testify that there was a great lapse of time. Indeed, he had the opportunity to do so, but did not provide this court with any statement as to a lapse of time.

11

So, effectively, the court accepts the testimony and finds Detective Sheehan's testimony to be highly credible that this was one continuous conversation, that the [Petitioner] was exceedingly talkative and, to put it in Detective Sheehan's own words, [Petitioner] never did stop talking and I couldn't stop the [Petitioner] from talking.

Now, the court further finds that not only is the credibility of Detective Sheehan very high . . . but the court observed his credibility from the witness stand and finds that he was truthful, that he had recollection of those matters that were important to him, that certainly he couldn't recall every small detail of what he had said on two prior occasions. The court further finds that he has no interest in the outcome of this case.

To the contrary, the court finds that [Petitioner's] credibility is not high and the court does not accept his statements as true to the extent that they vary from Detective Sheehan's . . .

Now, based on these findings, the court further finds that [Petitioner] truly never did invoke his right to remain silent by the mere use of the phrase "I'm not going to tell you anything," Or, put another way, if one were to accept the fact that there is some doubt as to whether he did, this court's alternative finding was that he gratuitously continued the conversation offering his explanation after asking the question, "What do you have on me."

The court finds that the duty to clarify urged by [Petitioner] is not applicable under the facts of this case. The duty does not apply to a continuous conversation . . .

When [Petitioner] urges the position that there was an absolute duty of the State through Detective Sheehan to stop any conversations, the court finds that the case law does not support that proposition on the facts of this case and, once again, the totality of the circumstances must be taken into consideration.

12

(ECF No. 9-34 at 19-24.)

The Appellate Division then found Petitioner's claim was "without sufficient merit to warrant extensive discussion in a written opinion" and affirmed the trial court's denial of the claim "substantially for the reasons articulated by Judge Pogarsky in his comprehensive oral opinion." (*Id.* at 24.) The Appellate Division added the following:

> We find no unfairness in the judge's rulings concerning the scope of defense counsel's cross-examination of Detective Sheenan. [Petitioner] was well represented and Detective Sheehan was subjected to a vigorous and lengthy cross-examination by defense counsel. The findings, analysis, and conclusion by the judge that [Petitioner] voluntarily and knowingly engaged in a continuous conversation with Detective Sheehan, and did not invoke his right to remain silent is supported by adequate, substantial credible evidence in the record. *See State v. Locurto*, 157 N.J. 463, 470-71, 474 (1999); *State v. Johnson*, 42 N.J. 146, 161-62 (1964). This is not a circumstance as in *State v. Hartley*, 103 N.J. 252, 255-56 (1986), where fresh *Miranda* warnings are required before additional interrogation because a defendant has asserted in clear and unequivocal terms his right to remain silent after having been given initial *Miranda* warnings.

(*Id.* at 24-25.)

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination. *See Malloy v. Hogan*, 378 U.S. 1, 8 (1964). In *Miranda*, the United States Supreme

13

Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Pursuant to *Miranda* and its progeny, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." *See Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (citing *Miranda*, 384 U.S. at 444).

"When police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985). Conversely, a waiver of the right to remain silent renders self-incriminating, inculpatory statements admissible. *See North Carolina v. Butler*, 441 U.S. 369, 374–376 (1979). Such waiver may be made orally, in writing, or even implied by the interrogated person's conduct. *See id.* Correspondingly, a trial court can properly admit a defendant's inculpatory statements if the court finds that the government met its preponderance-of-the-evidence burden showing that the statements were made with a valid waiver of *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).

In determining whether there has been a valid waiver of *Miranda* rights, a court must conduct a two-part inquiry ensuing from the "totality of the circumstances" test. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the court looks to the voluntariness of the waiver to determine whether it was made "freely," as opposed to one obtained by coercion. *See id.* Second, the court must consider whether the waiver was made "knowingly and intelligently," in the sense that the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

As explained above, on direct appeal, the Appellate Division rejected Petitioner's claims that Detective Sheehan did not honor Petitioner's exercise of his right to remain silent and that he was denied his Sixth Amendment right to confront Detective Sheehan. The Appellate Division considered the totality of the circumstance and found that Petitioner did not invoke his right to remain silent and instead his statement that he was "not going to tell [Detective Sheehan] anything" was part of continuous conversation in which Petitioner then immediately asked the detective what evidence they had on him. The Appellate Division noted that Detective Sheehan shared the evidence police had with Petitioner and Petitioner continued talking and provided a confession.

This Court must presume the state courts' factual findings that Petitioner voluntarily waived his *Miranda* rights and that he voluntarily chose to give

statements to police are correct. *See* 28 U.S.C. § 2254(e)(1). Petitioner has not rebutted these findings by clear and convincing evidence or shown that they were unreasonable in light of the evidence in the record. *See* 28 U.S.C. § 2254(d)(2). The state courts' factual findings are also well supported by the evidence of record. Petitioner acknowledged that he was informed of his *Miranda* rights, and he signed a form waiving his *Miranda* rights. Petitioner does not argue that he requested counsel or that the conversation was not continuous as the Appellate Division found. The trial court found Detective Sheehan credible and found Petitioner was not credible. Petitioner has presented nothing to this Court to overcome the presumption that the state courts' factual findings were correct.

The Court has reviewed the record and cannot conclude that the state court decisions were objectively unreasonable. The state court made detailed factual findings to support the decision that Petitioner waived his *Miranda* rights and did not subsequently invoke them or say something that required police to clarify if Petitioner was invoking his *Miranda* rights. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). Additionally, the Appellate Division's decision on the matter is consistent with *Miranda* and its progeny. *See Berghuis*, 560 U.S. at 381-82; *see also Davis v. United States*, 512 U.S. 452, 461-62

(1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him"). The Appellate Division's decision was not contrary to this federal precedent nor was it an unreasonable application of that precedent. Therefore, habeas relief is not warranted on Ground One.

### B. Ground Two

In Ground Two, Petitioner argues that state court violated his rights under the Confrontation Clause of the Sixth Amendment. (ECF No. 1 at 10-11.) Petitioner claims that during the remand hearing on this issue of whether he invoked his *Miranda* rights, the state court prevented Petitioner from cross-examining Detective Sheehan about his ability to recollect. (*Id.*)

Petitioner raised this claim on direct appeal and the Appellate Division found Petitioner's claim was "without sufficient merit to warrant extensive discussion in a written opinion" and affirmed the trial court's denial of the claim "substantially for the reasons articulated by Judge Pogarsky in his comprehensive oral opinion." (ECF No. 9-34 at 24.) The Appellate Division added that it found "no unfairness in the judge's rulings concerning the scope of defense counsel's cross-examination of Detective Sheenan. [Petitioner] was well represented and Detective Sheehan was subjected to a vigorous and lengthy cross-examination by defense counsel." (*Id.*)

During the remand hearing, the trial court noted the purpose of the remand hearing was "isolated to the issue of whether or not [Petitioner] invoked his right to remain silent." (ECF No. 9-20, Remand Hr. 2/19/02 at 21:10-12.) The trial court found defense counsel was permitted to cross-examine Detective Sheehan to impeach his credibility regarding only the testimony he gave at the hearing. (*Id.* at 22:5-16.) Defense counsel then attempted to cross-examine Detective Sheehan regarding his recollection of the number of other cases the detective had handled and the trial court sustained an objection, finding defense could not go "outside the scope of this witness' testimony on this narrow issue today." (*Id.* at 24:2-13.) The trial court limited defense counsel to cross-examining Detective Sheehan regarding the testimony he provided about his recollection of Petitioner's waiver of his *Miranda* rights and the subsequent conversation between Petitioner and Detective Sheehan. (*See generally id.*) Defense counsel engaged in a lengthy and thorough cross-examination of what Detective Sheehan recollected regarding Petitioner's waiver of his *Miranda* rights. (*See id.* at 27-64.)

The Confrontation Clause guarantees a criminal defendant the right to confront "the witnesses against him." U.S. Const. amend. VI. "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States." *Michigan v. Bryant*, 562 U.S. 344, 352 (2011) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)). The Confrontation Clause bars the "admission of testimonial statements of a witness

who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). "As to the second requirement, the Confrontation Clause requires that a defendant have had 'a full and fair opportunity to probe and expose [testimonial] infirmities' of an unavailable government witness in order for that witness's prior testimony to be admissible." *Ross v. Dist. Attorney of Cnty. of Allegheny*, 672 F.3d 198, 206–07 (3d Cir. 2012) (citing *United States v. Owens*, 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15 (1985))).

Here, Detective Sheehan is not a "witness who did not appear," rather he testified on his own behalf half at the remand hearing. As found by the Appellate Division, defense counsel was permitted to perform a lengthy and exhaustive cross-examination of Detective Sheehan regarding the issue before the trial court on remand. On this record, the Court cannot find that the Appellate Division's rejection of the confrontation claim was contrary to or an unreasonable application of clearly established federal law or an unreasonable application of the facts. Accordingly, Petitioner is not entitled to habeas relief on Ground Two.

## C. Ground Three

The third ground for habeas relief submits that Petitioner's Sixth Amendment rights were violated when the trial court failed to suppress Petitioner's confession

because Detective Sheehan used trickery to convince Petitioner to inculpate himself, rendering his confession involuntary. (ECF No. 1 at 11.)

The trial court held a suppression hearing based on Petitioner's allegation that his confession was not voluntary based on Detective Sheehan's "trickery." (*See* ECF Nos. 9-5, 9-6.) The trial judge noted that after Petitioner inquired into what evidence the detective had, Detective Sheehan advised Petitioner "someone was murdered, that they've arrested one party, that they've recovered two weapons, they have fingerprints implicating [Petitioner], and that this other party arrested has already spoken to them indicating that he was implicating [Petitioner]." (ECF No. 9-6, Pre-Trial Hr. N.T. at 102:21 to 103:2.) Detective Sheehan testified that "everything he told [Petitioner] was true, but for the fact that they had [Petitioner's] fingerprints on the weapon." (*Id.* at 103:2-5.) The trial court considered all of the testimony and made the following finding:

> I am satisfied, I find that I am convinced beyond a reasonable doubt that the defendant Jermaine Vaught was given his required *Miranda* Warnings and Rights on the morning of June 9, 1995. That he understood all of those rights based upon the fact that he is an intelligent young man. Articulate. A graduate of high school. That he has had prior involvement with the criminal process by virtue of having had six prior juvenile arrests and one prior adult arrest. I am further satisfied and find beyond a reasonable doubt that [Petitioner] knowingly, intelligently and voluntarily waived each of those constitutional rights given to him by virtue of signing S-2 in evidence. I further find that the police procedures with regard to that phase of speaking to [Petitioner] to have been professional as

expected. That there was no force, intimidation or pressure or coercion of any kind upon [Petitioner].

I further find and I'm convinced beyond a reasonable doubt, that Officer - - Detective Sheehan once he secured the waiver, discussed with [Petitioner] the fact that he has some evidence and he wished [Petitioner] to speak with him. And while the detective candidly admitted that he wasn't truthful with regard to one of the representations, namely the representation that law enforcement has the fingerprints on the deadly weapon. I'm satisfied that such lone example of trickery or artifice is not sufficient and does not rise to the level of negating [Petitioner] making a voluntary statement. That the impact of the other representations are - - were truthful and proper means of a trained detective to induce a criminal suspect to speak with him. That such is a proper procedure for law enforcement. The issue becomes whether or not ultimately [Petitioner] when giving the statement gives it voluntarily and of his own free will with his will not being overborne. And I am convinced beyond a reasonable doubt that [Petitioner's] will was not overborne and that he freely and voluntarily and openly gave that statement.

(*Id.* at 111:19 to 113:10.) On direct appeal, the Appellate Division denied Petitioner's claim that the trial court erred in failing to suppress his statement to police based on Detective Sheehan's trickery. (ECF No. 9-26 at 41-43.) The Appellate Division found the following:

We have carefully reviewed the record and conclude that the factual determinations made by Judge Alan J. Pogarsky are adequately supported by the evidence, and we accept them. R. 2:11-3(e)(1)(A); *State v. Locurto*, 157 N.J. 463, 472 (1999.) In addition, we are satisfied that the judge applied the correct legal principles in rejecting [Petitioner's] argument that his statement should be suppressed and conclude that [Petitioner's] arguments are

> without sufficient merit to warrant discussion. *See* R. 2:11-
> 3(e)(1)(E).

(*Id.* at 42-43.)

Coercive police activity" is a "necessary predicate" to holding a confession constitutionally involuntary. *See Connelly*, 479 U.S. at 167. However, there is a distinction between police trickery as a means of coercion and police trickery as mere strategic deception; "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). In other words, a law enforcement agent may use some psychological tactics or even actively mislead a defendant in order to obtain a confession, provided that a rational decision remains possible. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (stating police misrepresentation that co-defendant had confessed did not render otherwise voluntary confession inadmissible). As a general rule, police can lie to a suspect about the extent of the evidence against the suspect or feign friendship with the suspect without fear of rendering the resulting confession involuntary. *See id.* at 731, 737–39. "Subtle pressures may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity v. State of N.J.*, 385 U.S. 493, 496 (1967); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (stating test for determining voluntariness

of confession is whether, in light of all surrounding circumstances, defendant's will was overborne).

Here, Petitioner has already been advised of his *Miranda* rights, waived them, and was aware that any statement made would be used against him. Although a knowing and voluntary *Miranda* waiver does not necessarily demonstrate that a subsequent statement was voluntary, it does show that Petitioner knew he had the right to remain silent, yet he still provided a statement. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985) (acknowledging that suspect's choice to speak after receiving *Miranda* warnings is highly probative of voluntariness). Therefore, the question before the Court is whether Detective Sheehan's statement that Petitioner's fingerprints were on one of the weapons so seriously changed the circumstances that Petitioner's answers were no longer voluntary, knowingly and intelligent. *See Wyrick v. Fields*, 459 U.S. 42, 47 (1982).

After reviewing the totality of the circumstances, the Court finds that Detective Sheehan's statement regarding the fingerprints did not amount to coercive police activity rendering Petitioner's statement unvoluntary. Detective Sheehan made that statement after Petitioner was informed of his *Miranda* rights, after he signed the *Miranda* waiver form, and after Petitioner asked what evidence police had against him. Detective Sheehan was honest in informing Petitioner that they had the weapons and Petitioner's co-defendant had been arrested and implicated

Petitioner. The Court does not find that the added false information that police had Petitioner's fingerprints was so coercive that it misled Petitioner into waiving his already waived *Miranda* rights and making a statement. The Appellate Division's determination that the trial court did not error in finding Petitioner's statement voluntary was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, Ground Three is denied as meritless.

## D. Ground Four

In Ground Four, Petitioner argues that this Sixth Amendment right to a fair trial was violated when the trial court failed to instruct the jury that it must consider whether Petitioner's confession was corroborated by other credible evidence. (ECF No. 1 at 12.)

Petitioner raised this claim on direct appeal and the Appellate Division denied it, finding the claim was "without sufficient merit to warrant discussion in a written opinion." (ECF No. 9-34 at 13.)

That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), cert. denied, 534 U.S. 919 (2001). A petitioner can, therefore, only show an entitlement to habeas relief based upon allegedly inadequate jury instructions where the petitioner proves that "the ailing

instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That a challenged instruction was "undesirable, erroneous, or even universally condemned" is insufficient to warrant habeas relief; a petitioner can only prevail on such a claim by showing that the instruction rendered his trial fundamentally unfair. *Id.* Additionally, courts may not judge the instruction in isolation but must consider the instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72.

Where the error is the omission of an instruction, a petitioner's burden is "especially heavy" because an omission is "less likely to be prejudicial than a misstatement of the law." *See Estelle*, 502 U.S. at 155. In such a case, a petitioner must demonstrate that the omission was so "inconsistent with the rudimentary demands of fair procedure" as to result in a miscarriage of justice. *See Smith v. Arvonio*, No. 93-25, 1994 WL 327123, *3 (D.N.J. June 24, 1994) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).

Petitioner has not met this "especially heavy" burden. Even assuming arguendo that it was an error to charge the jury specifically on corroboration, the record does not show that the lack of such a charge resulted in a miscarriage of justice. There was sufficient evidence at trial corroborating the trustworthiness of the confession to support the conviction, including eyewitness testimony and

Petitioner's own testimony at trial. Accordingly, Petitioner has failed to show that the trial court erred by not providing a corroboration instruction, or that his conviction was a violation of due process. As Petitioner has not demonstrated a wrong of constitutional dimension sufficient to warrant federal habeas relief, Ground Four will be dismissed.

### E. Ground Five

The fifth ground for habeas relief submits that Petitioner's Sixth Amendment right to a fair trial was violated when the trial court failed to comply with the jury's request for a written summary of the elements of each charge and by then failing to inform the jury that it had the option of being re-charged on the elements. (ECF No. 1 at 12.)

Petitioner raised this claim on direct appeal and the Appellate Division denied it, finding the claim was "without sufficient merit to warrant discussion in a written opinion." (ECF No. 9-34 at 13.) The state appellate court's determination that the trial court's jury instructions were proper under state law is binding upon this court on habeas review. "[F]ederal habeas corpus review does not lie for errors of state law." *Estelle*, 502 U.S. at 68; *see also Johnson v. Rosemeyer*, 117 F.3d 104, 110, 115 (3d Cir. 1997) (A federal district court in a habeas corpus case cannot decline to follow the opinion of a state intermediate court of appeal with respect to jury instructions on state law rendered in earlier proceedings involving the petitioner, and

noting that "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause.").

Petitioner has not demonstrated that the Appellate Division's decision regarding the jury's request for a written summary of the elements of every charge against Petitioner was contrary to or an unreasonable application of United States Supreme Court precedent. Petitioner has cited no United States Supreme Court decision, and this Court has not located any, addressing a criminal defendant's constitutional right to the jury receiving a written list of the elements of the charges against the defendant or delineating the manner in which a trial court should respond to a jury's request for such. In the absence of United States Supreme Court precedent on this issue, this Court cannot conclude that the Appellate Division's decision regarding written elements to the jury was contrary to or an unreasonable application of United States Supreme Court precedent.

Accordingly, to prevail on this claim, Petitioner must establish that the state court's actions violated the "'fundamental fairness' essential to justice." *Marra v. Larkins*, 46 F. App'x 83, 87 (3d Cir. 2002) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Petitioner has not made such a showing.

During deliberations, the jury sent a note to the judge, requesting the court provide the jury with the written elements of the charges aggravated manslaughter, reckless manslaughter, and robbery. (ECF No. 9-17, Trial Tr. 3/23/1999 at 57:2-4.)

The trial judge explained to counsel that he does not routinely provide the jury written elements of the charges, stating:

> When I deliver my charge, while I rely heavily upon the model charges, my charge is not cohesively contained in pieces of paper which lend itself to being given to the jury, i.e, I have my own notations contained in margins, I have crossings outs, I have highlighted certain passages, which from perspective I wish to highlight to the jury . . . In other words, while I do believe my charge is organized in its delivery, I think if someone took my same charge in its current form and looked at it, someone else might conclude that it is confusing. And consequently, I am reluctant to provide the jury with the written elements of the charges in the present fashion that the Court has them.

(*Id.* at 57:18 to 58:7.) The government noted at that early stage of deliberations an offer could be made to the jury that if they had any specific charge they did not understand and would like the elements re-recited, they could come back later in deliberations. (*Id.* at 58:9-20.) Defense counsel agreed and noted that if the Court was inclined it could later give a basic list of the elements of each charge. (*Id.* at 59:2-23.) The trial judge explained that the concern with truncating, even in summary fashion, a portion of a charge for a substantive crime is "the lack of use and emphasis of all of the language by merely isolating the elements." (*Id.* at 60:17-21.) The trial court then informed the jury that it could not provide them with the written elements of the charges because they were not in an appropriate form. The court instructed the jury to rely on its combined recollection of the court's

28

instructions as to the law on all of the elements of the offenses and if after further deliberations they needed assistance, to advise the court. (*Id.* at 62:6 to 63:19.)

The Court's review of the record reveals nothing to indicate that the trial judge abused his discretion in his handling of the jury's request for written elements of the charges and violated the fundamental fairness essential to justice. Rather, the record suggests he dealt with the jury's request in a manner that expedited a fair and reasoned response to them. The Appellate Division's affirmance of the trial court's decision did not violate Petitioner's constitutional right to fundamental fairness. Therefore, Petitioner is not entitled to habeas relief on Ground Five.

## F. Ground Six and Ground Eight, Subclaim One

In Ground Six, Petitioner argues that his Sixth Amendment right to a fair trial was violated when the PCR court erred in failing to suppress Petitioner's confession as it was the product of an illegal arrest. (ECF No. 1 at 13-14.)

Petitioner failed to raise this claim on direct appeal. He, did, however, include the claim before the PCR court on collateral appeal. The PCR court did address the merits of the claim, however, the court found that the claim was procedurally barred pursuant to N.J. Ct. R. 3:22-4[2], based on Petitioner's failure to raise the claim on direct appeal. (*See* ECF No. 9-34 at 45.)

---

[2] New Jersey Court Rule 3:22-4(a) provides:

(a) First Petition for Post-Conviction relief. Any ground for relief not raised in the proceedings resulting in the conviction, or in a post-conviction proceeding brought and decided prior to the

A habeas claim is procedurally defaulted where "a state court declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement." *Lark v. Sec'y Pa. Dep't of Corrs.*, 645 F.3d 596, 611 (3d Cir. 2011) (quoting *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)). Put differently, where the state court dismissed a Petitioner's claim pursuant to an "independent" and "adequate" state procedural ground, federal habeas corpus review is not available. *See id.* New Jersey Court Rule 3:22-4 is an independent and adequate state law ground. *See Cabrera v. Barbo*, 175 F.3d 307, 314 (3d Cir. 1999) (N.J. Ct. R. 3:22-4 provided an independent and adequate state ground to procedurally bar the petitioner's federal habeas claim.) Therefore, Ground Six of the habeas petition is procedurally defaulted.

Procedural default may be excused where Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

---

adoption of this rule, or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds:

(1) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or

(2) that enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice; or

(3) that denial of relief would be contrary to a new rule of constitutional law under either the Constitution of the United States or the State of New Jersey.

miscarriage of justice." *Cristin v. Brennan*, 281 F.3d 404, 412 (3d Cir. 2002) (quoting *Coleman*, 501 U.S. at 750). Cause that is sufficient to excuse a procedural default "will 'ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Cristin*, 281 F.3d at 420 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "Cause" generally "cannot be based on the mere inadvertence of the petitioner or petitioner's counsel to take an appeal." *Id.*; *see also Murray*, 477 U.S. at 486 ("[T]he mere fact that counsel failed to recognize the factual or legal basis or a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.") Nevertheless, ineffective assistance of counsel may constitute cause for procedural default, but only where the attorney's ineffectiveness rises to the level of a Sixth Amendment violation. *Cristin*, 281 F.3d at 420.

In Ground Eight, subclaim one, Petitioner argues that trial counsel was ineffective for failing to adequately conduct a pre-trial investigation in order to adequately challenge Petitioner's confession as it was a product of an illegal arrest. (*See* ECF No. 1 at 17.) The Court construes this claim as asserting cause for Petitioner's default of Ground Six. Petitioner raised this claim on collateral appeal and the PCR court denied it, noting that it had already found that Petitioner's statement was properly obtained and assuming arguendo there was a defect in the issuance of a warrant, it was of no consequence. (ECF No. 9-34 at 45.)

31

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *See Strickland*, 466 U.S. at 687. To establish an ineffective assistance of counsel claim, a petitioner must first prove "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In analyzing counsel's performance, the court must be "highly deferential." *Id.* at 689. The Supreme Court explained:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are

alleged not to have been the result of reasoned professional judgment. *Strickland*, 466 U.S. at 690. The reviewing court then must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance." *Id.* It follows that counsel cannot be ineffective for declining to raise a meritless issue. *See Premo v. Moore*, 562 U.S. 115, 124 (2011).

The second part of the *Strickland* test requires a petitioner to demonstrate that counsel's performance "prejudiced the defense" by depriving petitioner of "a fair trial, a trial whose result is reliable." 466 U.S. at 687. To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, it is unnecessary to evaluate the other prong, as a petitioner must prove both prongs to establish an ineffectiveness claim. *Id.* at 697. Moreover, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice…that course should be followed." *Id.*

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" *See Woods*,

575 U.S. at 316 (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)); *see also Pinholster*, 563 U.S. at 190 ("[R]eview of the [State] Supreme Court's decision is thus doubly deferential."); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard . . . ."); *see also Yarborough v. Genrty*, 541 U.S. at 1, 6 (2003) ("Judicial review of a defense attorney . . . is therefore highly deferential--and doubly deferential when it is conducted through the lens of federal habeas."). Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *See Harrington v. Richter*, 562 U.S.86, 105 (2011).

As noted above, the PCR court alternatively considered the merits of Petitioner's claim that his confession was fruit of the poisonous treat because it was the product of an illegal arrest. The PCR court denied the claim as meritless, finding:

> [Petitioner] contends that he was involuntarily taken to police headquarters without a valid arrest warrant and therefore his statement given to police must be suppressed. The argument is rejected. Adrian Davis was murdered on June 5, 1995. [Petitioner] was taken into custody on June 9, 1995. Jeremiah Bass gave a statement to the police on June 6, 1995, inculpating [Petitioner]. On that same day, June 6, 1995, [Petitioner] suffered gunshot wounds in an unrelated accident and was hospitalized. Police placed a guard at his hospital room and when he was released on June 9, 1995, he was conveyed to police headquarters where he was advised of his *Miranda* rights. Thereafter,

> he gave a formal statement. On that same day formal
> complaints charging murder and weapons offense were
> signed. Whether the municipal court conducted a timely
> probable cause hearing is of no consequence, since
> [Petitioner] had previously given a knowing and voluntary
> statement to the police. Parenthetically, even though it is
> of no consequence here, the indictment cured whatever
> deficiencies may have existed with respect to probable
> cause. [Petitioner's] confession was not fruit of the poison
> tree. *Wong Sun v. United States*, 371 U.S. 471 (1963).

(ECF No. 9-34 at 44.)

The state court fully considered this claim and found that Petitioner's confession was not fruit of the poisonous tree, noting that police had transport Petitioner to headquarters after his co-defendant implicated him in the shooting and Petitioner than waived his <u>Miranda</u> rights and knowingly and voluntarily provided a statement to police. Petitioner fails to show that the PCR court's decision was contrary to or an unreasonable application of federal law.

The Court cannot find trial counsel was ineffective for failing to raise a claim that the state court has found to be meritless. It is well established that when a claim predicating an ineffective assistance of counsel claim is meritless, the ineffective assistance of counsel claim is also meritless. *See Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998) (finding ineffective assistance of counsel claim was meritless because the underlying claim was meritless). Therefore, the Superior Court did not err when it decided Petitioner's ineffective assistance of counsel claim was meritless because the defective arrest warrant claim is meritless. Additionally, Petitioner's

claim of ineffective assistance of counsel does not amount to cause to excuse his procedural default of Ground Six. Accordingly, Ground Six is dismissed as procedurally defaulted and Ground Eight, subclaim one is dismissed as meritless.

### G. Ground Seven

In Ground Seven, Petitioner argues that his Sixth Amendment right to a fair trial was violated when the PCR court failed to conduct an evidentiary hearing to address all of the claims raised by Petitioner.

The failure to conduct an evidentiary hearing in PCR proceedings is insufficient to require habeas relief. Indeed, "the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998); *see also Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("habeas proceedings are not the appropriate forum for [a petitioner] to pursue claims of error at the [State's collateral] proceeding."); accord 28 U.S.C. § 2254(a) (federal habeas relief available for violations of the Constitution, laws or treaties of the United States). Thus, Ground Seven, which seeks habeas relief based on procedural shortcomings in the collateral PCR proceedings, does not present a valid basis for habeas relief. *See Davis v. New Jersey*, No. 12-5748 (JLL), 2014 WL 2615657, at *17 (D.N.J. June 12, 2014)

(petitioner's assertion that "PCR court erred by not holding an evidentiary hearing ... fails to state a cognizable § 2254 claim."). Accordingly, Ground Seven is dismissed.

## H. Ground Eight

In Ground Eight, Petitioner raises several claims arguing that trial counsel and appellate counsel provided ineffective assistance. The Court will address them in turn.

### 1. Ground Eight, Subclaim Two

In Ground Eight, subclaim two, Petitioner argues that trial counsel was ineffective for failing to request an intoxication charge and for failing to obtain expert testimony regarding Petitioner's intoxication. (ECF No. 1 at 17.)

Petitioner raised this claim on collateral appeal. The PCR court noted the summarized trial counsel's PCR hearing testimony regarding intoxication as follows:

> [Petitioner] told [counsel] that he had been smoking PCP, marijuana and drinking alcohol. [Counsel] did not specifically recall discussing the defense of intoxication with [Petitioner]. [Counsel] hired no expert to consult on the effects of PCP on one's mind. He did not pursue the defense of intoxication. [He testified,] [i]n my experience, the intoxication defense, voluntary intoxication is not a very popular defense. It doesn't have a lot of jury appeal and I didn't think that the facts were there to really raise it, and I did not think we would succeed, and would probably risk more harm than good." "Basically, based on [Petitioner's] statement, based on my conversations with [Petitioner], it did not appear that an intoxication defense would be successful or even appropriate." [Counsel]

> testified that in the 39 years that he has been an attorney, he has pleaded intoxication approximately twelve times. On a couple of occasions he hired an expert. In none of those cases was intoxication PCP. He was unsuccessful in establishing intoxication in all of the cases in which it had been pled. [Counsel testified] "[w]hen you talk about a crime of violence, it's not a very good defense. Perhaps a property offense or something that does not involve somebody being hurt is different." "The information I had from [Petitioner] was not supportive of an intoxication defense."

(ECF No. 9-34 at 41.) On collateral appeal, the Appellate Division denied this claim finding that "an evidentiary hearing was conducted over two days, but [Petitioner] did not . . . produce the specific facts and expert testimony to support a finding that [Petitioner] had a viable intoxication defense. Without such evidence, [Petitioner] cannot establish that trial counsel failed to follow objectively reasonable standards in the conduct of [Petitioner's] defense." *Vaughn*, 2009 WL 3460267 at *5.

Under federal law, a failure to investigate potentially exculpatory evidence or witnesses may form the basis of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690-91; *see also Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). To successfully establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained . . . and whether such information, assuming admissibility in court, would have produced a different result." *See Brown*, 2016 WL 1732377, at *5

(quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted)). The petitioner must also still demonstrate he suffered prejudice. *See Strickland*, 466 U.S. at 690-91. But, where a petitioner merely speculates as to what a witness might have said if interviewed by counsel and does not present sworn testimony from that witness, a petitioner will not be able to establish the prejudice prong of *Strickland. See Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001) (citing *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989)).

Petitioner fails to make any argument regarding evidence in support of an intoxication defense to show that trial counsel's explanation as to his belief that an intoxication defense would not have been supported was not the result of reasonable professional judgment. Additionally, it is axiomatic that a petitioner's "failure to include a sworn statement regarding the nature of [an expert's] proposed testimony is fatal to his making a prima facie showing of prejudice" as to the failure to call such an expert at trial. *Tolentino v. United States*, No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014); *see also Duncan*, 256 F.3d at 201-02. Petitioner has identified no expert who was willing to provide testimony in support of his claim, therefore, he has failed to show any prejudice flowing from counsel's alleged failure to call such a witness, and this claims therefore fails to set forth a valid basis for habeas relief. Petitioner cannot demonstrate the state court's adjudication was an

unreasonable application of clearly established federal law. Thus, Petitioner's claim is denied.

## 2. Ground Eight, Subclaim Three

In Ground Eight, subclaim three, Petitioner argues that trial counsel was ineffective for failing to call co-defendant Jeremiah Bass to testify to the affidavit in which Bass admits he was coerced into implicating Petitioner. (ECF No. 1 at 17.)

Trial counsel testified at the PCR hearing and the PCR court summarized his testimony relevant to this claim as follows:

> [Counsel explained] [t]he juvenile co-defendant, Bass, supplied the defense with an affidavit saying that he never told the police the [Petitioner] was involved. [Counsel] made no application for the state to try Bass first, since he might be a potential witness for Vaughn, [counsel] noting that "Mr. Bass had initially inculpated [Petitioner] so that he was probably not good as a defense witness."

(ECF No. 9-34 at 41.)

Petitioner raised this claim on collateral appeal, however, it does not appear as though the state court's specifically addressed the claim. Where a petitioner fairly presents a claim to a state court, but the state court fails to address it, a federal habeas court reviews that claim de novo. *See Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) ("In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review."); *Holloway v. Horn*, 355 F.3d 707,

718 (3d Cir. 2004) (reviewing a claim *de novo* because Petitioner presented it to the Pennsylvania Supreme Court, but the court "failed to even mention" it).

As indicated above, trial counsel testified at the PCR hearing that he did not believe calling Petitioner's co-defendant, who had originally implicated Petitioner in the crime, was the right decision. Petitioner makes no argument regarding how that was not the result of reasonable professional judgment. Additionally, Petitioner confessed to the crime and his confession was introduced at trial. Petitioner fails to show how, considering his confession, there is a reasonable probability that, but for counsel's failure to call his co-defendant as a witness at trial, he would have been found not guilty. Petitioner has failed to meet either prong of the *Strickland* standard. Therefore, this claim is denied as meritless.

### 3. Ground Eight, Subclaims Four, Five and Six

In Ground Eight, subclaims four, five and six, Petitioner raises claims of ineffective assistance of PCR counsel on collateral appeal. (*See* ECF No. 1 at 17.) Petitioner argues (1) PCR counsel failed to call Trenton municipal court clerk Maria Cosme as a witness to Petitioner's arrest warrant violations, (2) PCR counsel failed to call Petitioner's co-defendant to testify to the affidavit he made, and (3) PCR counsel failed to call an expert witness regarding Petitioner's intoxication. (*Id.*)

Ineffective assistance of PCR counsel is not a cognizable habeas claim. *See* 28 U.S.C. § 2254(i). Pursuant to 28 U.S.C. § 2245(i), "[t]he ineffectiveness or

incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." The Supreme Court has similarly stated that "a petitioner cannot claim constitutionally ineffective assistance of counsel in [state post-conviction] proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). The limited exception to this rule is set forth in *Martinez v. Ryan*, 566 U.S. 1 (2012), which held that "[i]nadequate assistance of counsel as initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. Here, however, Petitioner's claims do not fall within the limited exception outlined by *Martinez* as he is not attempting to overcome a procedural default. Rather, he is attacking the effectiveness of his PCR counsel; claims that are prohibited by 28 U.S.C § 2245(i). Accordingly, Petitioner's claims alleging ineffective assistance of PCR counsel are denied.

## I. Ground Nine

In Ground Nine, Petitioner argues that his Sixth and Fourteenth Amendment rights were violated when the medical examiner testified at trial that the cause of death was homicide, which exceeded the scope of permissible expert testimony and improperly addressed the ultimate issue before the jury. (ECF No. 1 at 18.)

Petitioner raised this claim on direct appeal, and the Appellate Division denied it based on the following reasoning:

We first consider [Petitioner's] contention that the medical examiner's testimony that the cause of death was homicide "exceeded the scope of permissible expert testimony and improperly addressed the ultimate issue before the jury." The testimony of a medical examiner who is qualified only as an expert in forensic pathology should be limited to describing the physical properties of the implement that caused the victim's death, describing the physiological status of the body at the time of death, and ruling out the possibility that the injuries were self-inflicted or sustained as result of mere inadvertence. *State v. Jamerson*, 153 N.J. 318, 337 (1.998) (citations omitted). In other words, the forensic pathologist's testimony-should be restricted to describing the mechanics of death. *Id.* at 338. Since the determination of facts that tend to establish guilt or innocence is a function reserved exclusively to the jury, an expert's testimony that expresses a direct opinion that a defendant is guilty of the crime is improper. *Ibid.* (citing *State v. Odom*, 116 N.J. 65, 77 (1989). Thus, an expert is not permitted to testify that the death was a homicide, rather than an accidental killing. *Jamerson, supra,* 153 N.J. at 340.

Here, the State presented the testimony of Di. Raafat Ahmad, who was qualified as an expert in the field of forensic pathology. During direct examination, without objection, the following exchange occurred:

> Q. Doctor, based upon all of your gross anatomical findings made during the course of the autopsy, did you arrive at a conclusion regarding the cause of Adriene Davis's (sic) death?
>
> A. Yes.
>
> Q. Can you tell us what that was?
>
> A. The cause of death was contact entrance gunshot wound to the right chest.

Q. And finally, Doctor, based upon your examination of the body of Adriene Davis, did you arrive at a conclusion regarding the manner of death?

A. Yes.

Q. Can you tell us what that was?

A. Homicide.

Since there was no objection, we must analyze the contention in the context of the plain error rule. R. 2:10-2. Thus, we may only reverse if we conclude that the error raises a possibility that it led to an unjust result. *State v. Macon*, 57 N.J. 325, 335 (1971). However, "[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *Id.* at 336. To be sure, the critical issue for the jury to determine in this case was whether the killing was committed in the course of a robbery so as to constitute a felony murder, or whether it was an accidental shooting that did not occur in the course of a robbery. The medical examiner should not have been permitted to provide an opinion that the manner of death was homicide. The testimony was objectionable because the medical examiner was not qualified to give an opinion as to whether the death was caused by homicide, or by accident, and also because it invaded the province of the jury. Nevertheless, we conclude that the error was harmless because it does not raise a reasonable doubt that it caused the jury to reach a result it otherwise might not have reached. In *Jamerson*, the Court reversed because the medical examiner was extensively questioned and offered opinions as to the cause of an automobile accident which resulted in the death of the victim. He testified that the deaths were homicides, defendant was reckless, defendant's recklessness caused the deaths, and that an independent witness was mistaken when she said the

44

victim did not obey the stop sign because, in his opinion, the witness could not have possibly seen the stop sign from her position; *Jamerson, supra*, 153 N.J. at 339.

In this case, the objectionable portion of the medical examiner's testimony was much more limited. Moreover, the judge correctly explained to the jury that it was not bound by the expert's opinion. [Petitioner] was charged with felony murder, not purposeful or knowing murder. Felony murder is a strict-liability crime and does not require any intent for the homicide. *State v. Pantusco*, 330 N.J. Super. 424, 440 (App. Div.), *certif. den.*, 165 N.J. 527 (2000). Thus, even an accidental death that occurs during the commission of a predicate offense constitutes felony murder. Consequently, [Petitioner] would have been guilty of felony murder, even if the shooting was accidental.

We recognize that [Petitioner] denied he committed a robbery. Rather, he contended that the death was caused accidentally, not while in the course of committing a theft. The absence of theft would be a complete defense to the charge, of felony murder. Nevertheless, we have thoroughly reviewed the judge's instructions to the jury and conclude that the jury was clearly and unambiguously instructed that in order to find defendant guilty of felony murder, it must be satisfied-beyond a reasonable doubt that the death occurred during the commission of a robbery. Simply put, while it could be construed as an unwarranted endorsement of the State's theory, there was no possibility that the medical examiner's reference to homicide led the jury to reach a result it would not otherwise have reached. Thus, we conclude that the error was harmless.

(ECF No. 9-34 at 7-10.)

The Supreme Court has "adopted the general rule that a constitutional error does not automatically require reversal of a conviction"; the Court "has applied

harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991) (citing cases). Automatic reversal due to a constitutional error is required only if the error was a "structural defect" that permeated "[t]he entire conduct of the trial from the beginning to end" or "affect[ed] the framework within which the trial proceeds." *Id.* at 309–10. In contrast, if the error was a "trial error," a court conducts a harmless-error review. *Id.* at 307–08. A trial error "occur[s] during the presentation of the case to the jury, and . . . may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307–08. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v Clark*, 478 U.S. 570, 578–79 (1986).

A habeas petitioner, to prevail, must establish that a constitutional error resulted in "actual prejudice"-i.e., that it had a "substantial and injurious effect or influence in determining the jury's verdict." *Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir.2013) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)). This Court does not, strictly speaking, sit in review of the state court's harmless error analysis; it must perform its own. "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and

injurious effect' standard set forth in *Brecht, supra,* whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*], 386 U.S. 18 [1967]." *Fry v. Pliler,* 551 U.S. 112, 121–22 (2007); *see also Bond v. Beard,* 539 F.3d 256, 275–76 (3d Cir.2008) ("*Fry* instructs us to perform our own harmless error analysis under *Brecht* . . . rather than review the state court's harmless error analysis under the AEDPA standard."). In reviewing the record, if a federal habeas court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict, then the error was not harmless. *See Adamson v. Cathel,* 633 F.3d 248, 260 (3d Cir.2011) (citing *O'Neal v. McAninch,* 513 U.S. 432, 438 (1995)).

Here, there is no such "grave doubt" as to whether the expert's testimony that it was a homicide had a substantial and injurious effect or influence on the outcome of the trial. As explained by the Appellate Division, although the medical examiner's testimony that the cause of death was homicide was improper, Petitioner was convicted of felony murder, which is a strict-liability crime and even if the death was accidental, he could be guilty of felony murder if it occurred during the commission of a robbery. The trial court instructed the jury on felony murder. And the jury found Petitioner guilty of felony murder, which mean that they found he was guilty of the robbery. Whether the shooting was accidental, or a homicide is

47

inconsequential to that verdict. Thus, the expert's testimony was harmless and did not have a substantial or injurious effect on the jury's verdict. Petitioner is not entitled to habeas relief on Ground Nine.

**J. Ground Ten**

In Ground Ten, Petitioner argues that the trial court abused its discretion in sentencing Petitioner to a life term because a qualitative weighing of the aggravating and mitigating factors does not support such a sentence. (ECF No. 1 at 18.)

A federal court's ability to review state sentences is limited to challenges based on "proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies." *Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J. 1987)). Thus, federal courts may not review a challenge to a state court's discretion at sentencing unless it violates a separate federal constitutional limitation. *See Pringle v. Court of Common Pleas*, 744 F.2d 297, 300 (3d Cir. 1984)); *see also* 28 U.S.C. § 2254(a).

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" *Ewing v. California*, 538 U.S. 11, 20 (2003) (citations omitted). "A court must consider three proportionality factors when evaluating Eighth Amendment challenges: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences

imposed for commission of the same crime in other jurisdictions." *United States v. Burnett*, 773 F.3d 122, 136 (3d Cir. 2014) (citing *Solem v. Helm*, 463 U.S. 277, 290-92 (1983)). "In conducting this analysis, a court grants substantial deference to legislative decisions regarding punishments for crimes." *Id.*

The first factor acts as a gateway to the proportionality inquiry. The Eighth Amendment only forbids sentences that are "grossly disproportionate" for a conviction for the crime involved. *Butrim v. D'Ilio,* No. 14-4628, 2018 WL 1522706, at *16–17 (D.N.J. Mar. 28, 2018). If the petitioner fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge ends. Successful proportionality challenges in non-capital cases are "exceedingly rare." *Ewing*, 538 U.S. at 21 (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)); *United States v. Burnett*, 773 F.3d 122, 136–37 (3d Cir. 2014). "Absent colorable allegations that his sentence constitutes cruel and unusual punishment . . . or that it is arbitrary or otherwise in violation of due process, the legality and length of his sentence are questions of state law" over which this Court has no jurisdiction. *E.g.*, *Rabaia v. New Jersey*, No. 15-4809, 2019 WL 699954, at *12–13 (D.N.J. Feb. 20, 2019) (citing *Chapman v. United States*, 500 U.S. 453, 465 (1991)).

"Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." *United States v.*

*Miknevich*, 638 F.3d 178, 186 (3d Cir. 2011). Petitioner's life sentence is within the statutory limit for his felony murder conviction, and courts in this District have found that life sentences are not grossly disproportional for felony murder convictions. *See Wilson v. Cathel*, No. 04-4705, 2006 WL 3796863, at *10 (D.N.J. Dec. 21, 2006) (finding that a life sentence for felony murder did not rise to the level of disproportionality that violates the Eighth Amendment); *Peoples v. Cathel*, No. 05-5916, 2006 WL 3419787, at *12 (D.N.J. Nov. 21, 2006) (same). If Petitioner's life sentence is proportional for his felony murder conviction alone, then it follows that it is proportional when his other convictions are considered. "If the petitioner fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge ends." *Rollins v. Slaughter*, No. 19-13390, 2022 WL 2358387, at *17 (D.N.J. June 30, 2022). A life sentence for felony murder is not disproportionate. Consequently, Petitioner's sentence does not violate the Eighth Amendment. As such, Petitioner's tenth ground for habeas relief is denied.

## V. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. Thus, no certificate of appealability shall issue.

## VI. CONCLUSION

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability will not issue. An appropriate Order follows.

Dated:

PETER G. SHERIDAN, U.S.D.J.